*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Protective Proceedings of | ) ) ) | Supreme Court No. S-17192 |
| TIFFANY O. | ) ) | Superior Court No. 3AN-07-01380 PR |
| | ) ) ) ) | O P I N I O N |
| | ) | No. 7471 – July 24, 2020 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Eric Aarseth, Judge.

Appearances: Rachel O., pro se, Anchorage, Appellant. Erik A. Fossum, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for State of Alaska, Department of Health and Social Services, Division of Senior and Disabilities Services, and Adult Protective Services, Appellees. Notice of nonparticipation filed by Julie L. Webb, Office of Public Advocacy, Adult and Juvenile Representation Section, Anchorage, for Appellee Tiffany O. No appearance by Appellee Martha S.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

BOLGER, Chief Justice.

## I.     INTRODUCTION

A daughter was appointed as guardian for her mother, a woman in her 60s who suffers from epilepsy. The daughter relied on faith-based medicine to care for her

mother, electing to, in one instance, pray over her mother after she became nonresponsive instead of calling emergency services. The superior court ultimately removed the daughter as guardian, finding that her behavior and "intractable belief system" caused her to deprive her mother of appropriate services and care.

We conclude that the superior court did not abuse its discretion when it removed the daughter as her mother's guardian. We also conclude that removing the daughter as guardian did not violate the Alaska Constitution's free exercise clause because the State possessed a compelling interest in preventing harm to the mother.

## II.   FACTS AND PROCEEDINGS

### A.   Facts

Tiffany O.[1] developed epilepsy early in childhood and suffers regularly from seizures. She was also diagnosed with intellectual disability and was described by the court visitor as "unable to engage in a meaningful conversation." In 2007 Tiffany's daughter Rachel petitioned for the appointment of a guardian for Tiffany. She noted Tiffany's long-standing diagnosis of epilepsy, inability to secure long-term housing, and intellectual disability. Rachel did not want to be Tiffany's guardian at the time due to ongoing family conflict and her own caretaking duties for her two children. In March 2008 the superior court appointed the Office of Public Advocacy to serve as Tiffany's public guardian.[2]

After a period of working well together, the relationship between Rachel and the public guardian soured. In September 2010, after becoming increasingly

---

[1]     We use pseudonyms to protect the parties' privacy.

[2]     The guardianship appointment also included conservator power. *See* AS 13.26.316 (addressing general powers and duties of guardians); AS 13.26.520 (addressing appointment and general duties of conservators).

frustrated with the public guardian, Rachel twice petitioned for review of the guardianship. In June 2011 Rachel was appointed as Tiffany's guardian.

Rachel saw herself as Tiffany's "spiritual authority" due to her training in ministry. Furthermore, she believed that, because she graduated from a ministry school, she was justified in "rely[ing] entirely on prayer in lieu of hospital care" for her mother. Rachel, in a July 2018 motion for reconsideration, provided the court with an excerpt of the "About Us" section of her school of ministry's website which states, "As people come before the Lord in repentance [and] forgiveness, destroying the lies of Satan, . . . most emotional [and] physical diseases are healed [and] bodies return to peace [and] proper function."

By 2016 Rachel was concerned about whether her mother was receiving the right medication. In an email to the court visitor, Rachel reported that when Tiffany had seizures, Rachel prayed for her. She stated that it was up to Tiffany to self-administer her own medications. She also wrote that "psych meds aren't God!; nor are they life preserving, nor are they healing!"

Rachel's behaviors and beliefs prevented Tiffany from receiving valuable medical services. In 2016 Rachel fired Tiffany's personal care assistant. Tiffany's care was "consumer directed," meaning Tiffany's guardian could select an approved care provider for Tiffany, and the contract company, Easter Seals in this case, would pay for the personal care assistant services. After the firing, Easter Seals ended its contract with Tiffany, citing concerns that "the home environment is much too volatile, appears unsafe[,] and is not an appropriate situation for [Easter Seals] staff" due to Rachel's hostile behavior and communications.

The court visitor's report contained letters from two personal care providers and the State's Division of Senior and Disability Services. The two personal care

providers explained they were ending services for Tiffany because of Rachel, and the Division of Senior and Disability Services stated that Tiffany was in danger of losing state funding for personal care services if Rachel did not provide proper documentation.

**B.      Proceedings**

In June 2017 the Office of Public Advocacy filed a petition for review of guardianship after receiving a report that Rachel was financially exploiting Tiffany. Tiffany's daughter Martha also filed a petition for review of guardianship in June.  She alleged that Rachel was either physically abusing their mother or failing to keep her safe. An attorney was appointed to represent Tiffany in early July.  In September Adult Protective Services filed a motion to intervene due to additional reports accusing Rachel of financial exploitation and physical abuse.  Proceedings began before a magistrate judge on September 12, 2017, and ended on January 2, 2018.

During the proceedings, witnesses described two instances of Tiffany enduring physical harm.  Rachel also described these instances in emails to the court visitor.  The first occurred over Memorial Day weekend in 2017, when Tiffany fell in the garage while Rachel was sleeping.  Rachel decided to spray hydrogen peroxide on Tiffany's face to treat the injury.  Rachel testified before the superior court that she did not seek immediate medical care for Tiffany because she believed that doctors would have just told her that Tiffany had a concussion and to watch Tiffany while she was sleeping.  Rachel stated in an email to the court visitor that she refrained from going to the doctor because "all they would've done is document it all."

During the second incident, in October or November 2017, Rachel asked a family friend to come over and pray over her mother.  The family friend testified that when he arrived he found Tiffany lying on the floor.  He described her as "not very responsive."  Together, they moved her to the couch and prayed.

In August 2018 the superior court adopted the magistrate's recommendation to remove Rachel as guardian. The superior court remarked that a "conventional approach" to decision-making for a ward and "a faith-based, holistic view" are "not necessarily in opposition." However, in this case, "the situation [had] come to a head." The superior court was primarily concerned with Rachel's "hostility, bordering on paranoia, toward outside entities" that ensure that Tiffany gets the care she needs. The superior court found that Rachel's "deeply held convictions about medical care and state agencies" and her "intractable belief system" prevented her from pursuing reasonable care options for her mother. The superior court was particularly alarmed by the incident described by Rachel's witness when Rachel and family friends elected to pray over Tiffany rather than call an ambulance. The superior court found that the "Office of Public Advocacy should be substituted as guardian and conservator for [Tiffany]." Rachel appeals the superior court's order.

## III. STANDARD OF REVIEW

We review an order granting a request to remove a guardian under an abuse of discretion standard.[3] "The superior court abuses its discretion if it considers improper factors, fails to consider statutorily mandated factors, or assigns too much weight to some factors."[4] "Questions of statutory interpretation and constitutional law are . . . reviewed de novo."[5]

---

[3]     *H.C.S. v. Cmty. Advocacy Project of Alaska, Inc. ex rel. H.L.S.*, 42 P.3d 1093, 1096 (Alaska 2002) (citing 39 AM. JUR. 2D *Guardian and Ward* § 40 (1999)).

[4]     *Id*.

[5]     *Huffman v. State*, 204 P.3d 339, 343 (Alaska 2009).

## IV. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion When It Removed Rachel As Tiffany's Guardian.

Under Alaska Statute 13.26.286, the court may remove a guardian and appoint a successor.[6] The process for removing a guardian requires that a petitioner first demonstrate that there has been a change in circumstances since the guardian was appointed.[7] Then "the court must decide whether the existing appointment is in the ward's best interests."[8]

The record supports the superior court's determination that there was a change in circumstances. Rachel became Tiffany's guardian in 2011. By 2016 allegations arose concerning Rachel neglecting Tiffany's needs. These concerns were about Tiffany being physically abused and financially exploited. Rachel disagreed with the opinions of medical doctors regarding her mother's medication. In at least one instance, Rachel did not seek medical attention when her mother was nonresponsive. As the superior court stated, "Given [Rachel]'s strong beliefs and resistance to other options, the situation [had] come to a head."

Alaska Statute 13.26.311(d) dictates who has priority to serve as a guardian of an incapacitated person. The adult child of an incapacitated person typically has priority over the public guardian.[9] However, AS 13.26.311(f) provides that "in the best interest of the incapacitated person" the court may decline to appoint the person who has

---

[6] AS 13.26.286(a)(2)(B) ("On petition of the ward, the guardian, or any person interested in the ward's welfare, or on the court's own motion, the court may . . . remove a guardian and appoint a successor").

[7] *H.C.S.*, 42 P.3d at 1099.

[8] *Id.*

[9] AS 13.26.311(d).

priority under section (d). "If the court appoints a person with a lower priority" then it "shall make appropriate written findings related to why the best interests of the" incapacitated person necessitate the appointment of the lower priority individual.[10]

In *H.C.S. v. Community Advocacy Project of Alaska*, we discussed several important factors for a court to consider when determining whether a current appointment is in a ward's best interest.[11] The court should first "take into account the closeness of the ward's relationships to the existing and prospective guardians."[12] Next, the court can examine "[t]he length and quality of the existing appointments."[13] The court can also consider "[o]ther circumstances [that] may . . . be relevant in particular cases."[14]

In this case, while Rachel is Tiffany's daughter and cared for Tiffany as her guardian for several years, the superior court correctly noted that Rachel's beliefs and behavior constituted a barrier to Tiffany getting her needs met. The court pointed out that, due to her condition, Tiffany needs a guardian to make "objective decisions" for her. The superior court noted that a history of family tension and Rachel's "hostility, bordering on paranoia, toward outside entities" resulted in Tiffany "losing valuable services and resources to which she is entitled."

The superior court also noted that Rachel's belief system "foreclose[d] her willingness to consider other options" when it comes to obtaining medical care for her

---

[10]     AS 13.26.311(f).

[11]     42 P.3d at 1099-1100.

[12]     *Id.* at 1099 ("This inquiry gives weight to the substantive values that apparently underlie the statutory priorities for appointing guardians and conservators.").

[13]     *Id.* at 1100.

[14]     *Id.*

mother. The superior court was primarily concerned with the suggestion that Rachel may "rely entirely on prayer in lieu of hospital care."

The record supports the superior court's determination that there was a change in circumstances and that Rachel's appointment was no longer in Tiffany's best interest. The superior court did not abuse its discretion.

**B.    The Superior Court's Reliance On The Guardianship Statutes Did Not Violate Alaska's Free Exercise Clause**.

Rachel argues that it is "religious discrimination to replace [her] as guardian, because [she] care[s] for [her] mother based on the tenets of religion instead of how the State wants her [mother] cared for."[15] We interpret this to be an argument that Rachel's removal under the guardianship statute violated her rights to free exercise of her religion.

The Alaska Constitution's free exercise clause[16] states that "[n]o law shall be made respecting an establishment of religion, or prohibiting the free exercise

---

[15]    Rachel also argues that "[t]he guardianship statutes cannot be used in any matter to violate [her] mother's [First] Amendment rights." In the context of this case, it appears that Rachel argues that replacing her as Tiffany's guardian violated Tiffany's free exercise of religion. Generally, litigants lack "standing to assert the constitutional rights of another." *Keller v. French*, 205 P.3d 299, 304 (Alaska 2009) (quoting *State, Dep'ts of Transp. & Labor v. Enserch Alaska Constr., Inc.*, 787 P.2d 624, 630 n.9 (Alaska 1989)). Tiffany had appointed counsel in this case provided by the Office of Public Advocacy. Through this representation, Tiffany has the ability to assert constitutional claims on her own behalf. Tiffany's counsel filed a notice of non-participation in response to this appeal.

[16]    While the texts of the free exercise clause of the U.S. Constitution and the Alaska Constitution are nearly identical, we interpret the Alaska Constitution's free exercise clause to require a strict scrutiny analysis. W. COLE DURHAM & ROBERT SMITH, 1 RELIGIOUS ORGS. AND THE LAW § 3:26 (2017). Therefore, this analysis focuses on the Alaska Constitution rather than the U.S. Constitution because the Alaska Constitution provides a more protective standard. *Id.*

thereof."[17] As we have reiterated on numerous occasions, "[n]o value has a higher place in our constitutional system of government than that of religious freedom."[18] We use our independent judgment to review constitutional questions, "adopting the rule of law that is most persuasive in light of precedent, reason and policy."[19]

Alaska's free exercise clause was first interpreted in *Frank v. State*.[20] In *Frank* we determined that, to invoke a religious exemption from a facially neutral state law, three requirements must be met: (1) a religion must be involved, (2) the conduct in question must be religiously based, and (3) the claimant must be sincere in his or her religious belief.[21] "Once these three requirements are met, '[r]eligiously impelled actions can be forbidden only "where they pose some substantial threat to public safety, peace or order," or where there are competing governmental interests "of the highest order . . . [that] [are] not otherwise served." ' "[22]

Rachel meets the first *Frank* requirement because her beliefs regarding medical care are strongly informed by her religion. She meets the second requirement because her treatment decisions are based on her religious training and beliefs. And in

---

[17]     Alaska Const. art I, § 4.

[18]     *Sands v. Living Word Fellowship*, 34 P.3d 955, 958 n.11 (Alaska 2001) (alteration in original) (quoting *Frank v. State*, 604 P.2d 1068, 1070 (Alaska 1979)).

[19]     *Treacy v. Municipality of Anchorage*, 91 P.3d 252, 260 (Alaska 2004).

[20]     604 P.2d 1068, 1070-71 (Alaska 1979).

[21]     *Swanner v. Anchorage Equal Rights Comm'n*, 874 P.2d 274, 281 (Alaska 1994) (citing *Frank*, 604 P.2d at 1071).

[22]     *Id.* (first and fourth alterations in original) (quoting *Seward Chapel, Inc. v. City of Seward*, 655 P.2d 1293, 1302 n.33 (Alaska 1982)).

the absence of any evidence to the contrary, we assume that Rachel's religious beliefs are sincere.

With these three requirements met, the second part of the test under *Frank* requires that a facially neutral statute that interferes with religious-based conduct be justified by a compelling state interest.[23] In other words, the question becomes whether the government's interest in protecting Tiffany outweighs Rachel's interest in following her religious beliefs.[24]

The guardianship statutes reflect the government's strong interest in protecting the health and safety of a vulnerable ward. A guardian has the duty to "assure the care, comfort, and maintenance of the ward" and to "assure that the ward receives the services necessary to meet the essential requirements for the ward's physical health and safety."[25] A guardian may be dismissed if "there is an imminent danger that the physical health or safety of the ward will be seriously impaired."[26] These statutory interests are similar to the government's interests in protecting the life, health, and safety of other vulnerable groups, interests that we have previously found to be compelling.[27]

---

[23] *Frank*, 604 P.2d at 1074 (citing *Sherbert v. Verner*, 374 U.S. 398, 407 (1963)).

[24] *Swanner*, 874 P.2d at 282.

[25] AS 13.26.316(c)(2)-(3).

[26] AS 13.26.286(e).

[27] *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 249 (Alaska 2006) (noting that the State has a compelling interest, under its *parens patriae* obligation, to protect the health of civilly committed individuals in certain situations); *Planned Parenthood of The Great Northwest v. State*, 375 P.3d 1122, 1139 (Alaska 2016) (noting that the State has a compelling interest in protecting the health of minors who seek abortions); *see also*
(continued...)

"[A]fter a court determines that the claimed exemption implicates a compelling government interest," the appropriate question "is 'whether that interest . . . will suffer if an exemption is granted to accommodate the religious practice.' "[28] Here there is evidence that, should this exemption be granted, Tiffany's health and safety would be at risk. If Rachel cares for her mother following the tenets of her religious beliefs, then she will abandon the duties described by the guardianship statutes, including the duty "to meet the essential requirements for [Tiffany's] physical health [and] safety."[29] By depriving her mother of personal care services and emergency services in favor of prayer, Rachel not only fails to satisfy the essential requirements under the statute, but also puts Tiffany's health and safety at risk.

Granting this exemption would be directly counter to the State's interest in protecting its most vulnerable citizens from harm. Rachel stated that if her mother were to have a heart attack or stroke, she would first pray for her rather than call emergency services. The threat to Tiffany's health, should she be returned to Rachel's care, is not speculative. While serving as guardian, Rachel did not ensure that Tiffany received her epilepsy medication as prescribed, putting Tiffany at significant risk.

Should Rachel be reinstated as guardian, Tiffany's health and safety will be seriously compromised. If Tiffany required immediate medical attention, the results

---

[27]     (...continued)
*Sampson v. State*, 31 P.3d 88, 96 (Alaska 2001) (noting that other courts have recognized substantial state interests in preserving life and protecting vulnerable persons).

[28]     *Larson v. Cooper*, 90 P.3d 125, 132 (Alaska 2004) (quoting *Frank*, 604 P.2d at 1073).

[29]     AS 13.26.316(a).

could be fatal. For this reason, while religious liberty is a fundamental right under the Alaska Constitution, the State's actions in this case are justified by a compelling interest.

## V. CONCLUSION

The superior court's judgment is AFFIRMED.