*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Protective Proceedings of | ) ) ) Supreme Court No. S-17916 |
| BARON W., a Minor. | ) ) ) ) ) O P I N I O N ) ) No. 7571 – November 19, 2021 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Lance Joanis, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Cecilia M. Aisha Tinker Bray, Assistant Attorney General, Fairbanks, and Treg R. Taylor, Attorney General, Juneau, for State of Alaska.

Before: Winfree, Maassen, Carney, and Borghesan, Justices. [Bolger, Chief Justice, not participating]

CARNEY, Justice.

## I. INTRODUCTION

The grandmother of an Indian child was appointed as the child's guardian. The Office of Children's Services (OCS) took emergency custody of the child after the grandmother admitted using methamphetamine and the child tested positive for the drug. After working with the grandmother to address her drug use and other issues, OCS petitioned to terminate the grandmother's guardianship.

Following a hearing, the superior court found that termination of the guardianship was in the child's best interests and removed the grandmother as guardian. The grandmother appeals, arguing that her removal violated the Indian Child Welfare Act (ICWA)[1] and that termination of the guardianship was not in the child's best interests. We affirm the superior court's removal of the grandmother as guardian.

## II.   FACTS AND PROCEEDINGS

### A.   Initial Guardianship

Baron W.[2] is the six-year-old child of Stacy W. and Darian R. Baron is an enrolled member in Darian's tribe; he is therefore an Indian child as defined by ICWA.[3]

From his birth until approximately May 2017, Baron lived with Stacy and her mother, Cecilia M. Stacy then moved and left Baron in Cecilia's care. Cecilia asserts that Stacy left due to drug use. At some point Stacy was prohibited from contacting Baron by a civil protective order and conditions of release in a criminal case.

In December 2017 Cecilia petitioned for guardianship of Baron, alleging that Stacy was unable to take "care of herself let alone [her] child." Stacy contested the guardianship but she did not attend the evidentiary hearing. Cecilia testified that Stacy continued to struggle with substance abuse, mental health issues, and homelessness. Cecilia also testified about her own history of drug abuse but stated that she had been

---

[1]     25 U.S.C. §§ 1901-1963. ICWA establishes "minimum Federal standards for the removal of Indian children from their families and [for] the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902.

[2]     Pseudonyms have been used to protect the parties' privacy.

[3]     *See* 25 U.S.C. § 1903(4) (" 'Indian child' means any unmarried person . . . under age eighteen and . . . either (a) a member of an Indian tribe or (b) . . . eligible for membership . . . and . . . the biological child of a member.").

clean since March 2015.  The court appointed Cecilia Baron's guardian in September 2018.

**B.      Emergency Removal And Petition For Removal As Guardian**

In July 2019, in response to a report that Cecilia was neglecting Baron, OCS took emergency custody and filed an emergency petition alleging that Baron was a child in need of aid (CINA).  According to the petition, Stacy had again been living with Cecilia and Baron, and engaging in drug use and domestic violence.  Cecilia had called Adult Protective Services requesting that Stacy be removed.  The petition also alleged that when caseworkers arrived, Cecilia admitted to using methamphetamine regularly and discontinuing her medication for bipolar disorder.  Caseworkers tested Cecilia and Baron for methamphetamine and both tested positive.  OCS alleged in the petition that Baron had "been exposed to ongoing family violence and substance abuse" and that emergency custody was necessary to protect him from "severe drug exposure, neglect, and mental injury by his mother . . . and grandmother."

OCS placed Baron in a foster home and proceeded with a CINA case against his parents.  In addition to the reunification efforts directed toward Baron's parents, OCS drafted and worked with Cecilia on a case plan.  Her case plan required her to obtain an integrated mental health and substance abuse assessment, substance abuse treatment, random urinalysis testing (UAs), and a psychological evaluation, and to enroll in parenting classes.

Cecilia's mental health and substance abuse assessment resulted in a recommendation of "medically monitored intensive inpatient services" at a level of care not available in Alaska.  Cecilia refused to leave Alaska for treatment, arguing that she was already clean.  OCS later offered Cecilia the opportunity for a reassessment, but she was not reassessed.

Cecilia participated in random UAs. After positive tests in July 2019, all of Cecilia's tests were negative for methamphetamine. Several tests were positive for other controlled substances, which appears to have been due to prescribed medication. The result of one test was deemed invalid, and she failed to show up for three tests.

Cecilia attended parenting classes and individual therapy. She also underwent a psychological and parenting evaluation in November 2019. The psychologist who evaluated her concluded that Cecilia had "serious psychological and substance issues" and had "a markedly less than minimally adequate ability to parent her grandson."

In April 2020 OCS moved to terminate Stacy and Darian's parental rights. The following month OCS filed a motion to remove Cecilia as guardian.

## C.     Removal Hearing

The superior court held an extensive evidentiary hearing on the motion to remove Cecilia as guardian over four days in July and September 2020. OCS began by calling the psychologist who conducted Cecilia's psychological evaluation and parenting assessment. The psychologist testified that Cecilia "glossed over her history" and "ha[d] difficulty identifying her child's needs, being responsive to them, maintaining [a] consistent routine, . . . [and] a . . . stable home." But he also acknowledged that he did not observe Baron, that Cecilia had done well by engaging with services, and that he had not received any updated information since he had conducted the evaluation. Although he noted that Cecilia was "attached to" and "love[d]" Baron, he concluded that she had a "less than minimally adequate ability to provide for [his] safety and well-being."

Among its witnesses OCS called the caseworker who had responded to the initial report in July 2019. She testified that Cecilia had "really tangential thinking," had been letting Stacy in and out of the house while under the influence of drugs, and admitted to recently using methamphetamine. OCS also called the administrator from

the program that performed Cecilia's and Baron's drug tests. She testified that Baron's positive methamphetamine result indicated repeated exposure.

OCS's final witness was the primary caseworker assigned to Baron's case. He testified about Cecilia's case plan. He explained that Cecilia was "good about" participating in UAs as well as assessments, therapy, and parenting classes. But he testified that she never followed through on the recommended substance abuse treatment and had once commented that she could easily "get around" the weekly testing.

Cecelia called a friend to testify on her behalf. The friend testified that she was aware of Cecilia's problems with Stacy and her own substance abuse, but asserted that Cecilia had been "more than clean" for the last year. She also called the guardian ad litem from the original guardianship case, who testified that during the time he was involved, Cecelia did a good job as Baron's guardian.

Cecilia testified that she used methamphetamine only infrequently to escape her problems and had never used it around Baron, leading her to suspect that his positive test was Stacy's fault. She said that she told OCS about her relapse in order to get help, that she "did what [OCS] told me to do," and that she had been clean for 14 or 15 months at the time of the hearing. Finally, Cecilia called her sobriety mentor who testified that despite a "slip" in sobriety, Cecelia had been sober for over a year and was active in her 12-step program.

The court admitted various exhibits that Cecilia offered, including UA results and Baron's Head Start records. The Head Start records indicated that Baron struggled with sensory issues and had trouble with toilet training while in Cecilia's care.

The superior court removed Cecilia as Baron's guardian. The court focused on OCS's motion to remove Cecilia as guardian but also made CINA findings. The court found that Cecilia's substance abuse and mental health issues posed a substantial risk of

physical harm to Baron, that OCS had made "reasonable and active efforts" to reunite Baron with Cecilia, and that those efforts were unsuccessful.

Cecilia appeals, arguing that her removal as guardian should have been governed by the same protections as a termination of parental rights under ICWA, including a finding of active efforts and "a definitive showing that there was a substantial risk of serious harm to Baron, if the family were reunified." Cecilia also argues that terminating the guardianship was not in Baron's best interests.

## III. STANDARD OF REVIEW

"The applicability of the Indian Child Welfare Act . . . to this proceeding is a question of law subject to our independent judgment."[4] "We will 'adopt the rule of law that is most persuasive in light of precedent, reason and policy.' "[5] We review an order granting a request to remove a guardian for abuse of discretion,[6] and we review underlying findings of fact for clear error.[7]

## IV. DISCUSSION

### A. The Removal Of Cecilia As Guardian Did Not Violate ICWA.

Cecilia argues that the superior court's order removing her as Baron's guardian was a violation of ICWA because there was insufficient evidence to support the

---

[4] *J.W. v. R.J.*, 951 P.2d 1206, 1209 (Alaska 1998), *overruled on other grounds by Evans v. McTaggart*, 88 P.3d 1078, 1084-85 (Alaska 2004).

[5] *Id.* (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979)).

[6] *In re Tiffany O.*, 467 P.3d 1076, 1079 (Alaska 2020).

[7] *See Jude M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 394 P.3d 543, 550 (Alaska 2017).

court's findings that OCS had made active efforts to reunite Baron with his family[8] and that Baron would be "substantially harmed if returned to [his] grandmother's care.'"[9] OCS responds that ICWA "does not apply to the actual legal proceeding at issue in this appeal."

Whether the ICWA protections sought by Cecilia apply to this proceeding is a threshold issue. The parties agree that Baron is an Indian child and therefore entitled to the protection of ICWA. But they dispute whether ICWA applies to this removal of guardianship proceeding. Because Cecilia argues that the superior court's decision violated ICWA's active efforts and serious harm requirements, the issue is whether those *specific* ICWA requirements apply to this proceeding. We hold that they do not.

The requirement that the court find that active efforts have been made and have proved unsuccessful is set forth in § 1912(d) of ICWA, which requires that:

> Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.[10]

---

[8] *See* 25 U.S.C. § 1912(d) (requiring proof "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful"); *see also* 25 C.F.R. § 23.2 (2016) (defining active efforts as "affirmative, active, thorough, and timely efforts . . . to maintain or reunite an Indian child with his . . . family").

[9] *See* 25 U.S.C. § 1912(e)-(f) (prohibiting foster placements or termination of parental rights in an ICWA proceeding absent a determination that continued custody by parent or Indian custodian is likely to result in serious emotional or physical damage to the child).

[10] 25 U.S.C. § 1912(d).

Thus, the active efforts requirement applies only to foster placements or termination of parental rights.

ICWA's requirement that the court find that continued custody of a child is likely to result in serious emotional or physical damage is found in § 1912(e)-(f). Section 1912(e) prohibits foster care placement "in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." Similarly, § 1912(f) prohibits termination of parental rights absent "a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." Like the active efforts requirement, the serious harm requirement applies only to foster care placements or terminations of parental rights.[11]

Because both the active efforts requirement and the serious harm requirement apply only to terminations of parental rights and foster care placements, we must decide whether the removal of the guardian constituted a termination of parental rights or a foster care placement under ICWA.

### 1. Removal of a guardian is not a termination of parental rights under ICWA.

ICWA defines "termination of parental rights" as "any action resulting in the termination of the parent-child relationship."[12] Cecilia concedes that she is "not technically Baron's parent" but argues that she should be treated as Baron's parent

---

[11]     25 U.S.C. § 1912(e)-(f).

[12]     25 U.S.C. § 1903(1)(ii).

because Cecilia was "in practice, the only primary caretaker — the only 'parent' — he has ever known." In addition, she argues that she was Baron's legal guardian and, under AS 13.26.167, "has the powers and responsibilities of a parent who has not been deprived of custody of a minor and unemancipated child . . . ." Her argument is both unpersuasive and inapposite. Even though she had "the powers and responsibilities of a parent,"[13] Cecilia was not Baron's parent and was not entitled to the protection of Alaska's CINA laws when OCS sought her removal as guardian.[14]

More importantly, however, Cecilia's argument overlooks the plain language of ICWA. ICWA explicitly defines "parent" as "any *biological parent* . . . of an Indian child or any Indian person who has *lawfully adopted* an Indian child, including adoptions under tribal law or custom."[15] Cecilia is not Baron's biological parent, and she has not adopted Baron. She is not Baron's parent according to ICWA's plain language.

Cecilia asserts that treating her differently than a parent is "extreme and overly formalistic," and "conflicts with the spirit and purpose of ICWA." But when "a statute's meaning appears clear and unambiguous, . . . the party asserting a different meaning bears a correspondingly heavy burden of demonstrating contrary legislative intent."[16] ICWA contemplates that both guardians[17] and extended family members

---

[13]     AS 13.26.167.

[14]     *Compare* AS 13.26.186(a), *with* AS 47.10.088 (providing fewer procedural and substantive rights to guardians in removal proceedings than to parents in termination proceeding).

[15]     25 U.S.C. § 1903(9) (emphasis added).

[16]     *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 992 (Alaska 2019) (quoting *State v. Fyfe*, 370 P.3d 1092, 1095 (Alaska 2016)).

[17]     *See* 25 U.S.C. § 1903(1)(i) (defining "foster care placement" to include
(continued...)

including grandparents[18] may be present in an Indian child's life, but it does not include either in the definition of parent.[19] And Cecilia does not provide us with any support for her request to read ICWA's definition of "parent" to mean anything other than what the plain text says. In fact, if we interpreted ICWA to provide guardians the same protections as parents, it would make it more difficult to reunite Indian children with their parents after the appointment of a guardian — the exact opposite of Congress's stated policy to "promote the stability and security of Indian tribes and families."[20] Because Cecilia is not Baron's parent under ICWA, her removal as guardian did not constitute a termination of parental rights for purposes of ICWA protection.

### 2. Removal of a guardian is not a foster care placement under ICWA.

ICWA defines "foster care placement" as an "action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated."[21]

---

[17] (...continued) "temporary placement in . . . the home of a guardian").

[18] *See* 25 U.S.C. § 1903(2) (defining "extended family member" to include grandparents).

[19] *See* 25 U.S.C. § 1903(9) (defining "parent" to include biological and adoptive parents).

[20] *See* 25 U.S.C. § 1902.

[21] 25 U.S.C. § 1903(1)(i).

Because foster placement, as defined by ICWA, involves removal from a parent or Indian custodian,[22] Cecilia must show that she is either Baron's parent or his Indian custodian. Cecilia is not Baron's parent under ICWA. Nor is she Baron's Indian custodian. ICWA defines "Indian custodian" as "any Indian person who has legal custody of an Indian child under tribal law or custom or under State law or to whom temporary physical care, custody, and control has been transferred by the parent of such child."[23] Although Cecilia was Baron's guardian, she is not Indian.[24] She therefore cannot qualify as an "Indian custodian." Cecilia's removal as guardian does not constitute a foster care placement as defined by ICWA.

Cecilia's removal as Baron's guardian does not qualify as either a termination of parental rights or a foster care placement; it is therefore not subject to ICWA's active efforts or serious harm requirements. Because these requirements do not apply, they were not violated, and Cecilia's removal as guardian did not violate ICWA.

## B. The Superior Court Did Not Abuse Its Discretion When It Found That Removal Of Cecilia As Guardian Was In Baron's Best Interests.

Cecilia also argues that the court abused its discretion by finding that removing her as a guardian was in Baron's best interests. OCS argues that the court did not abuse its discretion.

Cecilia's best interests argument combines the standard for removal of guardianship and the standard for termination of parental rights. She argues that the

---

[22] *Id.*

[23] 25 U.S.C. § 1903(6).

[24] ICWA defines "Indian" as "any person who is a member of an Indian tribe, or who is an Alaska Native and a member of a Regional Corporation . . . ." 25 U.S.C. § 1903(3). Cecilia is Caucasian and does not assert that she is a member of an Indian tribe or Alaska Native regional corporation.

court should not have "treat[ed] the matter as a garden variety guardianship" and that the court failed to consider what Cecilia characterizes as "OCS's passivity toward [her]." But this case concerns the removal of a guardian, not the termination of parental rights or foster care placement, so the superior court was not required to assess whether OCS's efforts crossed the line from passive to active.[25] We therefore apply the standard for removal of guardianship, not the standard for termination of parental rights.

### 1. The two-part standard used for removal of guardians of incapacitated persons is also the standard for removal of guardians of minors.

The process for removing a minor's guardian is governed by AS 13.26.186, which permits removal of a guardian "on the ground that removal would be in the best interest of the ward."[26] The court may terminate guardianship "[a]fter notice and hearing on a petition for removal."[27] We have not yet had occasion to look beyond that statutory instruction for a standard for removal of a minor's guardian. Both parties and the superior court assumed that the standard used for removal of an incapacitated person's

---

[25] *See* 25 U.S.C. § 1912(e)-(f) (setting forth active efforts requirement for terminations of parental rights and foster care placements in ICWA cases); *see also Jon S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 212 P.3d 756, 763-64 (Alaska 2009) (distinguishing between active and passive efforts in ICWA context).

[26] AS 13.26.186(a).

[27] AS 13.26.186(b).

guardian is used for removal of a minor's guardian,[28] even though the two processes are governed by different statutes.[29]  Both parties make the same assumption on appeal.

For incapacitated individuals "[t]he process for removing a guardian requires that a petitioner first demonstrate that there has been a change in circumstances since the guardian was appointed.  Then 'the court must decide whether the existing appointment is in the ward's best interests.' "[30]  The statute governing removal of a minor's guardian also requires that the removal be in the ward's best interests.[31]  Therefore the best interests prong of the analysis also applies for guardians of minors.

A closer question is whether we should adopt the changed circumstances requirement.  Neither party addressed this question because, like the court, both assumed that the same standard governed minor guardianships.  Nor does Cecilia challenge the changed circumstances determination.  Nevertheless we address it in the interest of establishing a consistent standard.

---

[28]     Both briefs cite cases concerning incapacitated persons' guardians for the standards governing removal of minors' guardians; they appear to accept as a given that the same standards will apply here.  The superior court followed the standard set by a case concerning an incapacitated person's guardian, but also mistakenly cited AS 13.26.286, which provides for removal of incapacitated persons' guardians, rather than AS 13.26.186, which concerns removal of minors' guardians.

[29]     *Compare* AS 13.26.186 (procedure for removal of guardian of minor)*, with* AS 13.26.286 (procedure for removal of guardian of incapacitated person).

[30]     *In re Tiffany O.*, 467 P.3d 1076, 1080 (Alaska 2020) (quoting *H.C.S. v. Cmty. Advoc. Project of Alaska, Inc., ex rel. H.L.S.*, 42 P.3d 1093, 1099 (Alaska 2002)).

[31]     AS 13.26.186(a) ("Any person interested in the welfare of a ward . . . may petition for removal of a guardian on the ground that removal would be in the best interest of the ward.").

The two-part standard for removal of guardians of incapacitated persons was developed in *H.C.S. v. Community Advocacy Project of Alaska, Inc.*[32] There we recognized that the applicable statutes did not "specif[y] any procedure for seeking removal," so we established procedures.[33] We "recognize[d] the potential for disputes over appointing guardians and conservators and efforts to remove them" and the emotional and financial cost of extended litigation, especially for families whose "relationships [are] already strained by the ward's circumstances."[34] Because similar issues can arise within families following divorce and custody litigation, we followed the two-part standard used to modify child custody awards, which requires first a showing of changed circumstances, and then a determination of best interests.[35] We reasoned that just as the changed circumstances requirement discouraged "discontented parents from continually renewing custody proceedings,"[36] such a requirement would "minimize repeated guardianship or conservatorship contests."[37]

The changed circumstances requirement is not grounded in the language of the statute for removal of guardians for minors, AS 13.26.186. It also does not appear in the statutory language governing removal of guardians of incapacitated persons.[38] Instead, we adopted the requirement based on policy considerations, including the

---

[32]    42 P.3d at 1099.

[33]    *Id.*

[34]    *Id.*

[35]    *Id.*

[36]    *Id.* (quoting *Nichols v. Mandelin*, 790 P.2d 1367, 1372 (Alaska 1990)).

[37]    *Id.*

[38]    *See* AS 13.26.286.

emotional and financial cost of "[e]xtended or repeated litigation over removal," the strain on family relationships caused by litigation, and the resulting need to "minimize repeated guardianship or conservatorship contests."[39] These policy considerations are no less important in litigation over minors' guardians. Families are just as likely to pursue extended and repeated litigation over removing a minor's guardian as they are the guardian of an incapacitated relative (or to try to modify child custody), and such litigation is just as likely to exact a high emotional and financial toll. We now adopt the same two-part standard used for the removal of guardians of incapacitated persons for the removal of guardians of minors. To remove the guardian of a minor, a petitioner must first show that the circumstances of the ward or guardian have changed materially since the guardian was appointed, and the court must then determine that the existing appointment is in the ward's best interests.[40]

### 2. The superior court did not abuse its discretion by determining that Cecilia's continued guardianship was not in Baron's best interests.

Cecilia argues that the court abused its discretion not only by "fail[ing] to recognize OCS's passivity toward Cecilia,"[41] but also by "overly crediting [the psychologist]'s report," failing to credit Cecilia's sobriety, relying "on a supposed correlation not supported by expert testimony to find that there was sufficient evidence to terminate the guardianship," finding that Cecilia ignored her mental illness, and

---

[39]     *H.C.S.*, 42 P.3d at 1099.

[40]     *Id.* Because the finding of changed circumstances was not challenged, we need not review it.

[41]     Cecilia's assertions that the court failed to recognize OCS's passivity toward her and found evidence sufficient to terminate the guardianship without expert testimony are based on the procedures required for foster placement or termination of parental rights in ICWA cases. Those requirements do not apply as we have discussed.

assuming without evidence that the foster placement is better for Baron than remaining in Cecilia's care.

Cecilia claims that the court gave too much credit to the psychologist's report, despite the psychologist's "own testimony which limited the impact of the report's negative conclusions," including that he had not observed Cecilia with Baron and that Cecilia had made positive efforts. But the court acknowledged limitations in the report, nonetheless finding that it was credible. That the psychologist acknowledged the report's limitations does not mean the court abused its discretion by crediting the report.[42] And as the psychologist testified, he conducted the evaluation in November 2019, several months after Cecilia stopped using methamphetamine, so Cecilia's continued abstinence would not necessarily have changed the conditions the psychologist observed. Cecilia argues that the report is contradicted by the fact that no harm came to Baron while she cared for him, but the court heard evidence that he was exposed to methamphetamine, missed school, struggled with toilet training, and used foul language, which the court found corresponded with Cecilia's escalating drug use. The superior court did not abuse its discretion by crediting the psychologist's report.

Cecilia also argues that the superior court failed to credit her sobriety. But the court did acknowledge Cecilia's sobriety and other positive traits. The court also acknowledged that Cecilia's UAs were mostly negative, with some no-show results that it treated as positive. However, the court found that although Cecilia had been sober "for some period," she had not sought treatment for her substance abuse issues. That finding is correct; Cecilia has not been treated for substance abuse. Contrary to Cecilia's argument, the court carefully considered the evidence of her sobriety. But it also took

---

[42] *See Gold Dust Mines, Inc. v. Little Squaw Gold Mining Co.*, 299 P.3d 148, 166 (Alaska 2012) ("Particular deference is due to the superior court's credibility determinations.").

into account the assessment's conclusion that Cecilia had a "high level of treatment need for substance abuse."

Next Cecilia contends that the court incorrectly found that she had ignored her mental illness. But Cecilia misinterprets the court's findings. She cites the court's statement that "there is a substance abuse issue that requires a high level of care. She has remained it appears for some period of time at this point sober; however, she is untreated and she has serious substance abuse issues." The court was referring to her untreated substance abuse; Cecilia herself admitted she has not received treatment for substance abuse. And the court had previously recognized that Cecilia saw a therapist. Cecilia's contention that the court found that she had ignored her mental illness is mistaken.

Finally Cecilia argues that there was insufficient evidence that Baron's foster home better serves his best interests. The statute governing removal of minors' guardians states that the "petition for removal . . . may, but need not, include a request for appointment of a successor guardian."[43] OCS did not argue that the foster family better cared for Baron, although a caseworker mentioned his "growing attachment" to them and noted that his sensory issues seemed to have abated. The court was not required to determine whether Baron's foster home, or any alternative to Cecilia's guardianship, was superior. The court's task was to evaluate whether removing Cecilia as Baron's guardian was in his best interests; it concluded that removal was.

The court extensively discussed the evidence, including evidence in Cecilia's favor, before concluding that removing her as guardian was in Baron's best interests. Cecilia has failed to establish that the superior court abused its discretion when it determined that removing Cecilia as guardian was in Baron's best interests. Accordingly we affirm the superior court's decision.

---

[43]     AS 13.26.186(a).

## V.     CONCLUSION

The superior court's order terminating guardianship is AFFIRMED.