*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| BETSY F., | ) |
| | ) Supreme Court No. S-19245 |
| Appellant, | ) |
| | ) Superior Court No. 4FA-20-00117 CN |
| v. | ) |
| | ) O P I N I O N |
| STATE, DEPARTMENT OF FAMILY | ) |
| & COMMUNITY SERVICES, | ) No. 7789 – September 26, 2025 |
| OFFICE OF CHILDREN'S SERVICES | ) |
| and LOUDEN TRIBE a/k/a GALENA | ) |
| VILLAGE, | ) |
| | ) |
| Appellees. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Earl A. Peterson, Judge.

Appearances: Courtney Lewis, Anchorage, for Appellant. Jennifer Teitell, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee State of Alaska. Benjamin J. Bonner and Pearl Pickett, Alaska Legal Services Corporation, Anchorage, for Appellee Louden Tribe. Nikole V. Schick, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Carney, Chief Justice, and Borghesan, Henderson, Pate, and Oravec, Justices.

HENDERSON, Justice.

## I. INTRODUCTION

An Indian child[1] was taken into emergency custody by the Office of Children's Services (OCS) following his birth. At the time, no relatives were available for placement, so he was placed in foster care with a family friend. Two and a half years later, the child's mother requested that he be placed with his great-grandmother. OCS denied the placement, and the great-grandmother requested a review hearing. After a hearing, the superior court affirmed OCS's denial of the change in placement, finding that the great-grandmother was unsuitable. The mother appeals, arguing that the superior court erred in not requiring OCS to prove it provided the great-grandmother active efforts under the Indian Child Welfare Act (ICWA). We conclude that ICWA did not require OCS to demonstrate active efforts toward the great-grandmother in this context, and that the superior court thus did not err. We therefore affirm the superior court's decision upholding OCS's denial of placement.

## II. FACTS AND PROCEEDINGS

In August 2020, Betsy F.[2] gave birth to Albert F., an Indian child within the meaning of ICWA.[3] Approximately two weeks later, OCS filed a petition for emergency custody, alleging that Albert was a child in need of aid, because Betsy tested positive for opioids and admitted using heroin and suboxone throughout her pregnancy, including within 24 hours of Albert's birth. OCS sought physical and legal custody of Albert and placed him in a non-Indian home because at the time there were "no available ICWA home[s] willing to care for an infant with [Albert's] needs." Early in

---

[1]     25 U.S.C. § 1903(4) ("[A]ny unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.").

[2]     We use a pseudonym for each individual to protect their privacy.

[3]     Albert is a member of the Louden Tribe, also known as the Galena Village.

the case, OCS approached Betsy's grandmother, Lana J., about whether she might be a placement option for Albert, and Lana declined to be considered for placement.

In March 2021, when Albert was seven months old, he was placed with a nonrelative foster parent, Amanda C. Amanda was licensed as a foster parent after a relative of Albert's father asked if she would be interested in caring for Albert. Amanda has been his foster parent ever since.

Almost two years later, in January 2023, Betsy made her first request for Albert to be placed with Lana and moved for a placement review hearing, seeking placement through adoption. After meeting with Lana and visiting her home in March, OCS denied placement with Lana "due to the conditions of the home being unsafe." OCS explained that the large number of items stacked in the home presented a safety danger for Albert, who at the age of two and a half, "could be injured if these items were to fall." Lana reached out to OCS again to schedule another visit. After the second walk-through, OCS found that there had been some improvements made to the condition of the house, but that "it was not significant enough that . . . there could be any change in the decision regarding the state of the house."

In June, Lana requested that the superior court hold a hearing to review OCS's placement denial. She argued for Albert to be placed with a relative to "learn his culture and . . . family history." She also contended that she had "cleared 95% of the boxes" from her home and planned to clear the rest in the next few days. She asserted that she would "make sure [Albert was] safe."

The superior court held a placement review hearing over three days in July and August 2023, and February 2024. OCS indicated that its greatest concern with placing Albert with Lana was the number of boxes and personal items stacked in the house, which would be a risk given that Albert was "of the age where he like[d] to climb on things and explore." An OCS caseworker testified that OCS had visited Lana's house a total of four times over the course of the year between Betsy's first request and the final day of the hearing. OCS determined that some improvements had been made

during that time, but that the extensive amount of clutter in the home continued to pose risks to Albert.[4]  The Tribe agreed that the conditions in Lana's home posed a safety hazard and that the home would not be an appropriate placement for Albert.

Lana explained that she had so many belongings in her home because there had been many recent deaths in the family and that she was the only one who would take responsibility over the items of those deceased family members.  She testified that she had not fully understood that the items in her house were the main obstacle to Albert's placement with her until hearing the OCS testimony at trial, but that she rented a storage unit to hold some of the items.  She also testified that OCS had not offered her any help or support to make her home safe for Albert.

In addition to the issues related to Lana's home, OCS had a lingering concern about Lana's general decision-making and judgment related to child safety.  In particular, it was concerned about Lana's lack of responsiveness in the case of a prior report of harm involving Betsy's first child.  In that case, OCS had received reports in August 2013 that the child was being neglected.  OCS had great difficulty making contact with the parents, as well as their family members, including Lana.  OCS subsequently learned that Lana had bought plane tickets for the parents to go to Oregon with the child.  OCS immediately contacted Oregon's child services department, but the child was ultimately found deceased in Oregon.  During the hearings regarding placement of Albert, Lana admitted buying the plane tickets for Betsy, her partner, and the child to go to Oregon in 2013.  She testified that she thought Oregon would be a better place for the family, and explained that she did not recognize any signs of addiction in Betsy or her partner when they moved to Oregon.  Lana claimed that she

---

**4**     For example, the kitchen was nearly impassable from items covering the floor, stacked feet off the ground.  The counter space in the home was completely covered with items stacked precariously.  Many items were also stacked above head height.  Boxes and items were stacked such that people would have nowhere to sit, or would have to walk sideways to navigate through the house.

had not been aware of the OCS investigation into, nor had she received any calls from the police about, Betsy's first child. However, the Tribe submitted evidence establishing phone contact between the police and Lana during the relevant time period.

OCS further related that it was concerned about whether Lana could identify people who were abusing substances and whether she would be able to protect Albert from such activity. It cited Lana's testimony that Betsy had hidden her substance use from Lana, such that she had been unaware of the severity of Betsy's addiction. Lana had also stated that she did not know Betsy was using drugs when she was pregnant with Albert. OCS was also concerned that Lana had allowed people to live in her home who she later came to suspect had been using substances while residing there. OCS ultimately asserted that it had concerns about Lana's "ability to make safe and prudent parenting decisions," as well as the effect her "lack of transparency" might have on Albert's safety.

In September 2024 the superior court affirmed OCS's denial of the request to place Albert with Lana. The court began by recognizing that, as a family member, Lana was a priority placement for Albert under ICWA, which was undisputed by the parties. The court then turned to whether Lana was a suitable caretaker, and if so, whether there was good cause to deviate from ICWA's placement preferences.

The court found "by clear and convincing evidence that OCS did not abuse its discretion in denying placement of [Albert] with [Lana]."[5] The court first found that Lana's home conditions were not suitable for Albert, given the hazards that persisted. The court also found that Lana conveyed "a disregard for OCS and for governmental authority in Alaska in general" and "demonstrated a disturbing trend toward misplaced loyalties where she supported troubled adult family members over vulnerable, in-need children." As a result, the court found that Lana would not prioritize Albert's needs

---

[5]     *See* AS 47.14.100(e) (establishing requirement of clear and convincing evidence of good cause for OCS when denying placement with preferred option).

over those of others. The court concluded that Lana was an unsuitable placement and noted that "the Tribe consistently approved placement with [Amanda]." Briefly citing AS 47.10.086(a) regarding reasonable efforts,[6] the court also found that OCS was not required to provide reasonable efforts to Lana to make her home suitable, such as "by moving boxes and removing the clutter," because she was not Albert's parent or guardian.

Betsy appeals.

## III.   STANDARD OF REVIEW

Determining whether ICWA requires that active efforts be provided to extended family members seeking placement of a child raises a question of law to which we would typically apply our independent judgment.[7] As an initial matter, though, OCS contends that we should apply plain error review to this question because Betsy raises it for the first time on appeal. Plain error requires an "obvious mistake" that is "obviously prejudicial."[8]

OCS correctly asserts that the only semblance of a discussion of active efforts during the placement review hearing was when Betsy's attorney asked Lana if OCS offered her "any assistance or support with this process at all," and Lana simply replied "[n]o." The remainder of the hearing, including closing arguments, focused solely on Lana's suitability as a potential placement for Albert.[9] This brief testimony

---

[6]     "[T]he department shall make timely, reasonable efforts to provide family support services to the child and to the parents or guardian of the child that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family home." AS 47.10.086(a).

[7]     *See Native Vill. of Tunanak v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 303 P.3d 431, 440 (Alaska 2013) ("Matters of statutory interpretation are . . . questions of law to which we apply our independent judgment.").

[8]     *Tuluksak Native Cmty. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 530 P.3d 359, 368 (Alaska 2023).

[9]     Betsy notably does not appeal the court's suitability determination.

before the superior court regarding assistance provided to Lana, or lack thereof, did not sufficiently raise the issue of whether OCS was required to demonstrate active efforts to facilitate placement with Lana. But while we agree that plain error review applies, our analysis of whether the court was obviously mistaken here ultimately turns on our interpretation of the requirements of ICWA. Here we reach the same conclusion whether applying de novo or plain error review.

## IV. DISCUSSION

Betsy's appeal centers on whether the superior court erred in not requiring OCS to demonstrate active efforts toward Lana before affirming its denial of placement with her. Additionally, Betsy argues that the court erred in citing AS 47.10.086 as the applicable statute because Albert is an Indian child and ICWA's active efforts requirement should therefore have applied to OCS's placement efforts toward Lana.[10] The Tribe joins Betsy in this argument — contending that AS 47.10.086 is not the applicable statute and that under ICWA, "OCS has a duty to *actively support* prospective extended family members seeking placement" to remedy suitability concerns.[11] OCS concedes that ICWA would be the relevant authority if efforts were due to Lana, but it argues that active efforts were not required in this placement review context and, regardless, that active efforts apply toward preserving the child's home with a parent or Indian custodian — of which Lana is neither. We must therefore examine whether ICWA requires active efforts to facilitate placement with an extended family member such as Lana.

We have addressed this question, but within a different context, just once before. In *Taryn M. v. Department of Family & Community Services, Office of*

---

[10]     *See* 25 U.S.C. § 1912(d).

[11]     The Tribe argues that while OCS owes this duty toward extended family members under ICWA, OCS fulfilled its duty here and extended sufficiently active efforts toward assisting Lana with overcoming concerns about her suitability as a placement for Albert.

*Children's Services*, we explained in a footnote that because Taryn was the child's "distant cousin,"[12] rather than a parent or Indian custodian, "OCS was not required to make 'active efforts' to [place the child] with her, as she argue[d]."[13] Unlike the present case, Taryn's argument was based upon the premise that she was an Indian custodian for the child in question, which we determined not to be the case.[14] We did not directly contemplate the pure legal question of whether ICWA's active efforts requirement applies outside of maintaining or reuniting the parent-child or Indian custodian-child units. We now consider this question in the first instance.

> ICWA's active efforts requirement provides:

> Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.[15]

Betsy's appeal arises from the requirement's use of the phrase "to prevent the breakup of the Indian family." "Indian family" is not defined by statute,[16] nor have we defined it previously. Betsy and the Tribe argue that the "Indian family" includes extended family members. OCS reiterates that ICWA's active efforts requirement does not apply in the context of a placement review hearing and that the statute's reference to "Indian family" in this context refers to parents and Indian custodians.

---

12    529 P.3d 523, 526 (Alaska 2023).

13    *Id.* at 530 n.17 (citing 25 U.S.C. § 1912(d)).

14    *Id.*

15    25 U.S.C. § 1912(d).

16    *See* 25 U.S.C. § 1903.

"We interpret statutes 'according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law . . . .' "[17] And "we must, whenever possible, 'interpret[] each part or section of a statute with every other part or section, so as to create a harmonious whole.' "[18]

At the outset, we look to ICWA's designation of who must make active efforts and when. ICWA requires a demonstration of active efforts by "[a]ny party seeking to effect a foster care placement . . . or termination of parental rights."[19] Here, the placement review hearing at issue did not address a question of terminating parental rights.[20] Nor did it contemplate placement of Albert into foster care. We have held that "foster placement, as defined by ICWA, involves removal from a parent or Indian custodian,"[21] and that ultimately, a foster care placement "modifies parental rights."[22] Here, Albert had already been removed from his parents, taken into OCS custody, and placed in a foster home well before Betsy's request that Albert be placed with Lana. While OCS's denial of the requested change in placement in this case involved consideration of ICWA's placement preferences under 25 U.S.C. § 1915(a) and (b),[23] among other things, it did not trigger ICWA's active efforts requirement under

---

**17** *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011) (quoting *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999)).

**18** *Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 761 (Alaska 1999) (alteration in original) (quoting *Rydwell v. Anchorage Sch. Dist.*, 864 P.2d 526, 528 (Alaska 1993)).

**19** 25 U.S.C. § 1912(d).

**20** Although OCS did file a petition to terminate parental rights, termination was not at issue in the placement review hearing that we are examining here.

**21** *In re Baron W.*, 498 P.3d 1045, 1051 (Alaska 2021).

**22** *Jude M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 394 P.3d 543, 553 (Alaska 2017).

**23** *Tuluksak Native Cmty. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 530 P.3d 359, 376-78 (Alaska 2023).

§ 1912(d). OCS need not have demonstrated active efforts prior to denying placement of Albert with Lana.

Consistent with ICWA's requirement of active efforts only where a party seeks to effect a foster care placement or to terminate parental rights — both actions that impact parental rights — we agree with OCS that the provisions of 25 U.S.C. § 1912 as a whole, including the active efforts requirement, anticipate preservation of the family unit of the Indian child with a parent or Indian custodian. As OCS points out, the other subsections of 25 U.S.C. § 1912 "create rights specifically for parents and Indian custodians." And 25 U.S.C. § 1912(d) speaks specifically to the active efforts required for preserving that family unit, prior to foster placement (including foster placement with extended family members) or termination of parental rights.

Elsewhere in ICWA, Congress ostensibly limited the active efforts requirement to parents and Indian custodians. For example, 25 U.S.C. § 1914 provides that only three groups — "[a]ny Indian child who is the subject of any action for foster care placement or termination of parental rights under State law," a "parent or Indian custodian from whose custody such child was removed," and "the Indian child's tribe" — can challenge an action which violated the active efforts requirement.[24] Extended family members, like Lana, do not have the ability to challenge such a violation of 25 U.S.C. § 1912(d), suggesting that the requirement does not apply to them.[25]

Further, in 25 U.S.C. § 1931(a), Congress explained that "[t]he objective of every Indian child and family service program shall be to prevent the breakup of Indian families, and in particular, to ensure that the permanent removal of an Indian

---

[24] 25 U.S.C. § 1914.

[25] *See id*.

child from the custody of his parent or Indian custodian shall be a last resort." This construction indicates that Congress was particularly concerned with the permanent removal of Indian children from the custody of a parent or Indian custodian, and further suggests that the Indian family unit referenced in § 1912(d)'s active efforts requirement does not include extended family members who are not Indian custodians. In light of ICWA's clear text, and considering its provisions as whole, we conclude that OCS was not required to provide Lana with active efforts in order to overcome her obstacles to suitability for placement.[26]

We observe that the question posed here by Betsy appears to be a novel one. No other state court appears to have directly addressed whether extended family members are due active efforts, but the few decisions that involve tangentially related issues do not offer an answer contrary to our conclusion. The decision most relevant here comes from the Utah Supreme Court, which held that a grandfather's appeal arguing that the state failed to afford him active efforts was moot.[27] The court held that the appeal was moot because the children had been placed with their fathers after the grandfather had filed his appeal, and therefore the grandfather was "no longer an 'Indian custodian.' "[28] While the court implicitly assumed that the grandfather would have been due active efforts had the children not been placed with their fathers, that assumption was based on the grandfather's legal relationship to the children as their Indian custodian, and not based on his familial relationship to them as an extended family member.[29]

---

[26] We note, however, that given the substance of the argument before the superior court, it was peculiar for the court to refer to "reasonable efforts" in a case controlled by ICWA.

[27] *Guardian ad Litem v. State ex rel. C.D.*, 245 P.3d 724, 728-29 (Utah 2010).

[28] *Id.* at 729.

[29] *See id.* at 728-30.

Admittedly, a few intermediate appellate courts have indicated a willingness to read into 25 U.S.C. § 1912(d) a requirement that active efforts be made to a child's extended family members. But none have explicitly done so. For example, in *In re L.N.W.*, the Iowa Court of Appeals explained that it did not "necessarily disagree with the appellant's contention that the party seeking termination must also demonstrate that services were also offered to the extended members" of an Indian child's family.[30] However, the court ultimately concluded that it "need not rule" on the necessary scope of the requirement because active efforts had in fact been offered to the child's extended family members.[31] Similarly, in *In re K.B.*, the California Court of Appeal held that "even if [it] assume[d]" that active efforts were due to extended family members, the record showed that the state agency had engaged in the requisite active efforts when considering whether to place the children with their maternal aunt and grandmother.[32] Thus, although these two intermediate appellate courts have expressed at least a willingness to consider an argument that extended family members are due active efforts under 25 U.S.C. § 1912(d), neither has wrestled with the issue directly as we do here.

Although we hold that ICWA's active efforts requirement did not apply in this context, we observe that other aspects of ICWA will often require that OCS communicate and work with a child's tribe and extended family members. For instance, 25 U.S.C. § 1915 lays out ICWA's requirements for various foster care and pre-adoptive placements, and makes clear that the highest priority placement for the Indian child is with a member of the child's extended family.[33] And § 1915(d), in turn,

---

[30]    457 N.W.2d 17, 20 (Iowa App. 1990).

[31]    *Id.*

[32]    93 Cal. Rptr. 3d 751, 764-65 (Cal. App. 2009).

[33]    25 U.S.C. § 1915(a).

provides that the standards to be applied in meeting ICWA's placement preferences are the prevailing social and cultural standards of the child's Indian community.

Additionally, direction from the Bureau of Indian Affairs (BIA) indicates that compliance with ICWA's emphasis on preserving the parent-child or Indian custodian-child family unit often requires working and communicating with tribes and extended family members. For example, in its regulations, the BIA has explained that "active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe."[34] In providing guidance to state courts, the BIA has also explained that active efforts to maintain or reunite Indian families should include "[e]ngaging the Indian child, the Indian child's parents, the Indian child's extended family members, and the Indian child's custodian(s)."[35] In this way, the BIA emphasizes the importance of being cognizant of, and communicating and working with, the people and entities vitally connected to the child in working to maintain or restore the familial relationship. Although we do not agree with Betsy's argument that 25 U.S.C. § 1912(d) required active efforts be provided to overcome Lana's suitability challenges, we must underscore that ICWA directs OCS and courts to engage extended family members when working to prevent the breakup of the Indian family.

---

[34] 25 C.F.R. § 23.2 (2016). Indeed, we have recognized that working with tribes and extended family members can contribute toward the active efforts OCS makes to reunify children with their parents or Indian Custodians. *See e.g.*, *Anton K. v. State, Dep't of Fam. & Cmty. Servs., Off. of Child.'s Servs.*, 554 P.3d 456, 470-71 (Alaska 2024).

[35] Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10,146, 10,150 (Feb. 25, 2015).

## V. CONCLUSION

We AFFIRM the superior court's decision upholding OCS's denial of placement.